Robert Telles #1290264
Ely State Prison
PO Box 1989
Ely, NV 89301

United States District Court
District of Nevada

| Jessica Coleman, et al., | Case No. 2:24-cv-00930-APG-MDC |
| Plaintiffs, | |
| vs. | |
| Robert Telles, et al., | Defendant Robert Telles's |
| Defendants. | Second Amended Counterclaim |

Comes Now Defendant/Counterclaimant Robert Telles ("Telles"), in proper person, and hereby submits his Second Amended Counterclaim. In support of this Second Amended Counterclaim, Telles states as follows:

I. Parties

1. Counterclaimant Telles, an individual, is, and at all times mentioned herein, was a resident of Clark County, Nevada.

2. Counter-defendant Jessica Coleman ("Coleman"), an individual, is, and at all times mentioned herein, was a resident of Nye County, Nevada.

///

///

3. Counter-defendant Aleisha Goodwin ("Goodwin"), an individual, is, and at all times mentioned herein, was a resident of Clark County, Nevada.

4. Counter-defendant Rita Reid ("Reid"), an individual, is, and at all times mentioned herein, was a resident of Clark County, Nevada.

5. Counter-defendant Kimberly McMahon ("McMahon"), an individual, is, and at all times mentioned herein, was a resident of Clark County, Nevada.

6. All possible third-party defendants have not been made known to Telles as of the filing of this Second Amended Counterclaim. Telles reserves the right to amend this Second Amended Counterclaim if subsequent investigation warrants so.

II. General Allegations

7. Telles realleges each and every prior paragraph in this Counterclaim as if fully set forth herein.

8. In November of 2018, Telles was elected as the Clark County Public Administrator, director to the Public Administrator's Office ("PAO").

9. On or about January 7, 2019, Telles began his term as the Clark County Public Administrator.

10. At that time, Coleman, Goodwin and Reid were already in the employ of the PAO.

11. Prior to Telles's term, the PAO utilized the services of only one vendor, one real estate agent, to prepare and sell all of the decedent real property managed by the PAO.

12. To reduce unnecessary delays and costs caused by the use of one vendor and to engage more local businesses, Telles started to utilize the services of more real estate agents.

13. In or around February of 2019, McMahon became a vendor to the PAO as a real estate agent listing real property managed by the PAO for sale.

14. Before Telles began his term at the PAO, the prior Clark County Public Administrator John Cahill ("Cahill") asserted to Telles and others that the PAO was failing because Clark County management refused to provide the PAO adequate staffing.

15. Telles found the actual reason for the office's failure was gross mismanagement by Cahill and Reid.

16. Reid had acted as the de facto director of the PAO during Cahill's tenure as the Clark County Public Administrator.

17. During Cahill's tenure, Reid micromanaged the day-to-day operations of the PAO.

18. Under Reid's management, cases were very frequently not being brought to completion and families were not receiving their funds.

19. Under Reid's management, homes with equity were needlessly foreclosed upon due to Reid's inaction.

20. Under Reid's micromanagement, checks made payable to families that required Reid's signature before mailing often expired before Reid could find the time to sign the checks.

21. Under Reid's management, family members of the deceased often waited years for the cases to close.

22. Under Reid's management, on more than one occasion a family member of the deceased died while waiting for money to be paid to them by the PAO.

23. Under Reid's management, the PAO frequently had complaints that were escalated to Clark County management

///

Page 3 of 17

24. Telles eliminated the micromanagement by taking control of the in-office day-to-day operations of the PAO.

25. Telles gave the in-office staff greater autonomy.

26. Reid still retained supervisory duties over the investigation team that operated in the field.

27. Reid still yet attempted to micromanage the in-office staff

28. Reid told the office staff to disregard directions from Telles.

29. Reid told the office staff to disregard any new policies set by Telles.

30. After learning of Reid's attempts to undermine Telles's direction Telles informed Reid that she should cease doing so.

31. On one occasion in or about January 2019, Reid acknowledged that operations had not gone well under her management.

32. Nevertheless, Reid continued her insubordinate behavior.

33. Telles advised the office staff to disregard Reid's directions and inform Telles of any attempts by Reid to undermine Telles's directions to them.

34 Reid told the office staff that they should not talk to Reid at all in an apparent attempt to make it appear that Telles told the office staff to not talk to Reid at all.

35. Telles also found that the office staff had been allowed to spend two to four hours of every day congregating to discuss their personal lives.

36. Because the office staff had to wait for Reid's unnecessary review of their work when Reid had already taken on too much work, the office staff had developed a habit of taking hours-long breaks while waiting for Reid.

///

Page  4  of  17

37. Several times, Telles requested that Goodwin, Noraine Pagdanganan ("Pagdanganan"), and Roberta Lee-Kennett ("Lee-Kennett") stop spending so much time in personal discussions.

38. Telles suggested that staff limit personal conversations to a couple of times per day for fifteen minutes, in addition to the lunch breaks and two fifteen-minute breaks already provided.

39. Despite Telles's requests, Goodwin, Pagdanganan, and Lee-Kennett continued their hours-long personal discussions

40. In or around mid-2019, Telles called Goodwin, Pagdanganan and Lee-Kennett into his office and ordered them to curtail their hours-long personal discussions.

41. In or around July of 2019, Pagdanganan asked Telles to pursue a pay scale increase for the estate coordinators, which at that time consisted of Goodwin, Pagdanganan and Lee-Kennett.

42. Under Cahill's tenure, Cahill and Reid had failed to secure a pay scale increase despite one or more attempts.

43. Telles worked with Goodwin and Lee-Kennett to prepare the paperwork justifying a pay scale increase.

44. Telles succeeded in securing a pay scale increase for the estate coordinators in one attempt.

45. In November of 2019, Telles decided to throw a holiday party, and in December of 2019, Telles, Coleman, Goodwin, Pagdanganan and other PRO staff collaborated to host the holiday party.

46. Telles paid for a taco truck, and Goodwin volunteered to bring several concessions, including popcorn, churros and nachos, at her own expense.

47. Telles thanked the staff both verbally and by email for making the event successful.

48. In or around mid-March of 2020, Clark County management responded to the COVID pandemic by directing all nonessential departments, which included most departments, to send their employees home with pay.

49. The PAO performed certain essential services, namely the recovery and safeguarding of decedent property, that required the PAO to continue operations at that time.

50. Telles was directed by Clark County management to provide a schedule with percentages of time to be worked by each employee during that period.

51. Telles consulted with Goodwin, Pagdanganan and Lee-Kennett to devise a schedule where all three would work.

52. Telles completed the schedule for the first time and emailed it to Clark County on March 18, 2020.

53. Later, with both Goodwin and Pagdanganan present, Lee-Kennett asked whether overtime would still be available.

54. Telles informed the three that overtime would be suspended for the foreseeable future given that only essential services were being performed.

55. The next day, Goodwin and Pagdanganan separately approached Telles stating they were fearful for their safety and wanted to stay home.

56. Telles then asked Lee-Kennett if she could still yet work during that period, and Lee-Kennett said yes.

57. Telles shared with Janie Osuzik ("Osuzik"), Telles's executive assistant, his belief that Pagdanganan only claimed she was fearful after Telles shared that there would be no overtime.

///

Page 6 of 17

58. Osozik, who was friends with Pagdanganan, apparently shared Telles's opinion with Pagdanganan.

59. On that same day, March 19, 2020 Telles provided to Clark County a revised schedule showing that Goodwin and Pagdanganan were no longer going to work during the COVID shutdown.

60. For the majority of the COVID shutdown employees who stayed at home were paid from federal relief funds.

61. During the final two weeks of the COVID shutdown federal funds ran out, and employees who stayed home were required to use their own leave for that period.

62. Pagdanganan used only approximately 5% of her accumulated sick leave to cover that period.

63. Clark County's nonessential-designated employees returned to work on May 18, 2020.

64. Also on May 18, 2020, Coleman, Goodwin and Pagdanganan engaged in an email exchange wherein they complained about the changes in the office, and Goodwin suggested they form an alliance.

65. Coleman, Goodwin and Reid (collectively "PAO Counter-defendants"), along with Pagdanganan, began to disparage the office amongst themselves and to others both in the office and outside the office.

66. Despite PAO Counter-defendants' behavior, Telles maintained appropriate and often friendly communications with all employees, including PAO Counter-defendants.

67. In August of 2020, Goodwin filed a Complaint with the Office of Diversity (the "OOD") at Clark County, the

office that handles discrimination and harassment complaints.

68. During the OOD's interview of Telles, questions to Telles centered on claims that Telles allegedly discriminated against Goodwin based on her religion, discriminated against Reid based on her gender, and that Telles sent Goodwin and Pagdanganan home so that he could be alone with Lee-Kennett during the COVID shutdown.

69. To Telles's recollection there was no question or other statement made during the OOD interview that pointed to who may or may not be a supporting witness to the allegations.

70. Telles provided his own account disputing the claims made known to him during the OOD interview.

71. The OOD found the allegations against Telles to be unsubstantiated as to any discriminatory conduct

72. Telles suffered emotional distress during the investigation.

73. Telles put the matter behind him and continued to work on improving the office.

74. On October 13, 2020, Telles issued a written warning to Coleman for causing a significant waste of resources and an inconvenience to a family when Coleman directed a part-time employee that Coleman had trained, Juanita Floyd, to sign for verification of property of a decedent despite a discrepancy, which was a serious failure on Coleman's part to exercise due care in the performance of her duties.

75. After the written warning, Telles instituted meetings to help Coleman succeed.

76. Telles, Coleman and Osuzik met periodically to discuss ways to help Coleman succeed.

77. Telles implemented several ideas proposed by Coleman during the meetings.

78. Telles was focused on helping Coleman succeed.

79. Telles did not escalate discipline against Coleman despite various errors committed by Coleman, including the loss of property.

80. Upon information and belief, the other PAO counter-defendants encouraged Coleman to believe that Telles wanted to terminate her.

81. After the COVID shutdown was over, new employees were being hired into the PAO.

82. Part of Pagdanganan's duties was to train the new employees.

83. Telles attempted to have Pagdanganan fill these duties.

84. Various employees complained that Pagdanganan would fail to explain things well and would then become upset at them for failing to understand her instructions.

85. Telles attempted to put Pagdanganan through training to improve her skills as a trainer.

86. Pagdanganan became agitated and seemingly offended that Telles suggested she needed improvement.

///

///

87. Many new employees began to seek training from Lee-Kennett because she was the next most knowledgable person and she was patient.

88. Lee-Kennett complained that she had to do Pagdanganan's job.

89. Upon information and belief, Lee-Kennett did not consider the extra burden a benefit or work perk of any kind.

90. Telles asked Lee-Kennett to continue providing the assistance until Telles could find another solution.

91. On March 10, 2021, Telles issued Reid a written warning for insubordinate behavior.

92. Telles had made numerous requests to Reid that she refrain from engaging in certain behaviors that negatively impacted operations and were also a concern for her health and safety.

93. To help Reid, Telles assigned Goodwin to assist with new case intake, a role where Goodwin was expected to excel due to her past investigative experience.

94. The PAO Counter-defendants became hostile toward other employees who worked toward the PAO's success.

95. The PAO Counter-defendants continued their hostility until Telles and the majority of new employees left the PAO.

96. The hostility was so severe that one employee had a panic attack and had to be taken to the hospital by an ambulance from the PAO parking lot.

97. Pagdanganan caused two new employees to cry on separate occasions.

///

98. In March of 2022, Reid announced she was running for the position of Clark County Public Administrator.

99. Upon information and belief, on or around April 28, 2022, one or more of the PAO Counter-defendants met with an agent of Compass Realty.

100. Upon information and belief, the parties to that meeting discussed a plan to remove Telles from his position as the Clark County Public Administrator.

101. On or around April 29, 2022, Reid posted donations by Compass Realty and Adam Fenn, an agent of Compass Realty, that totalled $10,000.00.

102. The PAO-Counter-defendants met with reporter Jeffrey German in or around early May of 2022 and made false claims to him about turmoil in the office and hostility by Telles.

103. On or around May 15, 2022, Jeffrey German put the false allegations of turmoil and hostility in a published news article.

104. Upon information and belief, Reid and Compass Realty had intended that the funds provided by Compass Realty be used to fund a text message campaign to share the article with voters.

105. In mid-June of 2022, Telles lost the primary election.

106. Despite the election loss, Telles continued to engage in legal action against Compass Realty for their theft of estate assets of deceased Clark County residents.

107. In or around early August of 2022, Goodwin and Reid falsely alleged to Detective Derek Jappe ("Jappe"),

Page 11 of 17

of the Las Vegas Metropolitan Police Department, that Telles was involved in a bribery scheme.

108. Upon information and belief, prior to their meeting with Jappe, Goodwin and Reid convinced McMahon to corroborate their false allegation of a bribery scheme in exchange for a restored business relationship with the PAO that had been terminated by Telles due to McMahon's performance issues.

109. In or around late 2020, Telles had stopped assigning real property to McMahon because of serious delays in preparing real property for sale, which caused unnecessary expense to the families of deceased residents of Clark County.

110. Upon information and belief Goodwin and Reid told McMahon to make to Jappe a false claim that Telles solicited money from McMahon for business from the PAO.

111. Upon information and belief, Goodwin and Reid created the bribery scheme story for another article to be written by Jeffrey German.

112. Upon information and belief, Goodwin may have also created the story for the benefit of and at the request of Compass Realty.

113. On September 7, 2022, Telles was arrested for allegedly murdering Jeffrey German.

114. The PAO Counter-defendants continued to make false allegations about Telles's conduct.

115. Goodwin created a new false allegation that Telles harassed her sexually by leering at her chest blatantly,

116. Coleman created a new false allegation that Telles sexually harassed her by entering her personal space and creating opportunities to touch her inappropriately.

117. Coleman created a new false allegation that Telles physically intimidated her by cornering her in the vault while making harassing comments.

118. Telles learned of the new false claims of sexual harassment and physical intimidation in or around March of 2024 when Coleman and Goodwin made the allegations on an episode of 48 Hours, a nationally broadcasted television show.

119. On May 17, 2024, the PAO Counter-defendants filed their Complaint in this matter, making false allegations of unlawful behavior by Telles.

120. Also on or around May 17, 2024, the PAO Counter-defendants circulated their Complaint to the media.

121. The PAO Counter-defendants asserted to the media that they filed their Complaint in honor of Jeffrey German.

122. The PAO Counter-defendants brought their meritless suit to create public bias against Telles in advance of his criminal trial.

123. In August of 2024, Jappe testified at Telles's criminal trial that Goodwin and Reid asserted to him that Telles was involved in a bribery scheme.

124. Jappe further testified that approximately one week later he met with and interviewed McMahon.

125. Jappe typed an interview report based on his interview of McMahon.

Page 13 of 17

126. In the interview report, Jappe stated that McMahon alleged Telles had requested money from her in exchange for referrals of PAO business.

127. On August 17, 2022, Jappe created a search warrant declaration wherein he expressly asserted that, according to an informant, Telles was receiving money from vendors in exchange for business from the PAO.

128. Jappe further testified that he found no evidence of any bribery scheme after his investigation was finished.

129. Telles did not and could not have learned about the false bribery police report by Goodwin and Reid before Jappe's testimony in August of 2024.

130. On June 16, 2025, the PAO Counter-defendants filed a pleading in this matter wherein it was McMahon who made the express assertion that Telles was receiving money from vendors in exchange for business from the PAO.

131. Upon information and belief, even if McMahon made the express assertion that Telles was receiving money from vendors in exchange for PAO business, McMahon did so pursuant to a prior made agreement to make false allegations of criminal conduct to the police in an exchange for a reestablished business relationship with the PAO.

132. Telles now brings this Second Amended Counterclaim.

///

///

///

## First Cause of Action
### (Slander Per Se Against Coleman and Goodwin)

133. Telles realleges each and every prior paragraph as though fully set forth herein.

134. Coleman made the false allegations that Telles sexually harassed her and physically intimidated her to several media outlets, including 48 Hours, a nationally televised program.

135. Goodwin made the false allegation that Telles sexually harassed her to several media outlets, including 48 Hours, a nationally televised program.

136. Telles suffered great embarrassment and extreme ridicule as a result.

137. Telles suffered extreme emotional distress as a result.

138. Telles suffered weight loss, anxiety and depression as a result.

139. Coleman's and Goodwin's false statements involve imputations of both a lack of fitness for Telles's profession as a supervisor/director and serious sexual misconduct.

140. As a direct and proximate result of Coleman's and Goodwin's conduct, Telles is entitled to compensatory damages.

141. As a direct and proximate result of Coleman's and Goodwin's conduct, Telles is entitled to punitive damages.

## Second Cause of Action
### (Civil Conspiracy Against Goodwin, Reid and McMahon)

///

142 Telles realleges each and every prior paragraph of this Counterclaim as though fully set forth herein.

143. Upon information and belief, Goodwin and Reid entered into an agreement with McMahon wherein they would make a false report to the police that Telles was involved in criminal conduct and McMahon would receive new business from the PAO for her participation in making the false report.

144. In early August of 2022, Goodwin and Reid falsely reported to Jappe, per his trial testimony in August of 2024, that Telles was involved in a bribery scheme.

145. Available documentary evidence showed that McMahon made a false allegation that Telles requested money from her in exchange for continued business from the PAO.

146. In a pleading in this matter, Goodwin and Reid asserted that McMahon made the express assertion that Telles was receiving money from vendors in exchange for business from the PAO

147. Upon information and belief, even if McMahon made the express and false assertion, McMahon did so pursuant to a prior made agreement with Goodwin and Reid wherein McMahon would once again receive business from the PAO for doing so.

148. Upon information and belief, Goodwin and Reid made up the false allegations of bribery to Jappe so the investigation could be reported in the media.

149. In or around November of 2022, the media reported that Telles was under investigation for bribery.

150. The publication of a bribery investigation into Telles caused him severe emotional distress.

131. As a direct and proximate result of Goodwin's, Reid's and McMahon's conduct, Telles is entitled to compensatory damages.

152 As a direct and proximate result of Goodwin's, Reid's and McMahon's conduct, Telles is entitled to punitive damages

## Prayer for Relief

1. That Plaintiffs/Counter-defendants take nothing by virtue of their Complaint in this matter;

2. For an award of compensatory damages for each of Telles's causes of action;

3. For an award of punitive damages for each of Telles's causes of actions;

4. For a jury trial on all issues triable by jury; and

5. For any other relief deemed appropriate by the Court.

Dated this 10th day of November, 2025.

Respectfully submitted:

Robert Telles
Counterclaimant
In Proper Person